833 F.2d 763
 56 USLW 2309
 Michael G. BRESGAL; Scott Landfield; Karl Gaines; Thomas
A. Wilson; Northwest Forest Workers Association;
Plaintiffs-Appellees, Cross-Appellants,
Agustin Villegas; Rene Guerrero; Jesus Ponce,
Plaintiffs-Intervenors, Appellees Cross-Appellants,
v.
William E. BROCK, Secretary of Labor, Defendant-Appellant,
Cross-Appellees.
 Nos. 86-3996, 86-4072.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 3, 1987.
Decided Nov. 18, 1987.
 
 Richard K. Willard, Charles H. Turner, Leonard Schaitman, and John S. Koppel, Washington, D.C., for appellant/cross-appellee.
 D. Michael Dale, Portland, Oregon, and Mary Lewis, Woodburn, Or., for appellees/cross-appellants.
 Appeal from the United States District Court for the District of Oregon.
 Before J. BLAINE ANDERSON, FARRIS and BRUNETTI, Circuit Judges.
 FARRIS, Circuit Judge:
 
 
 1
 The plaintiffs are the Northwest Forest Workers Association and individual migrant agricultural workers who have worked in forestry on a seasonal basis.
 
 
 2
 In the forestry business, as in more conventional agricultural industries, independent labor contractors often act as middlemen, hiring and transporting migrant workers for seasonal labor on land owned by others. Testimony before Congress indicated that the unscrupulous practices of independent labor contractors have injured owners and laborers alike:
 
 
 3
 It is unfortunately an all too common experience for workers to be abused by farm labor contractors. Testimony revealed that in many cases the contractor: exaggerates conditions of employment when he recruits workers in their home base, or that he fails to inform them of their working conditions at all; transports them in unsafe vehicles; fails to furnish promised housing, or else furnishes substandard and unsanitary housing; operates a company store while making unitemized deductions from workers' paychecks for purchases, and pays the workers in cash without records of units worked or taxes withheld.
 
 
 4
 Evidence has also emerged of contractor exploitation of farmers.
 
 
 5
 S.Rep. No. 1295, 93rd Cong., 2d Sess. (1974) reprinted in 1974 U.S.Code Cong. & Ad.News 6441, 6442. The Farm Labor Contractor Registration Act of 1963, 7 U.S.C. Sec. 2041 et seq., was enacted to prevent abuses by labor contractors. The original legislation proved ineffective, and in 1974 Congress broadened its coverage and strengthened its enforcement mechanisms. The Act (1) provides for registration of farm labor contractors with the Department of Labor, (2) requires disclosure to workers of conditions of employment, and (3) imposes standards for the payment of wages, health and safety in housing, and safety for vehicles in which workers are transported. In 1983 the Act was rewritten again, and was renamed the Migrant and Seasonal Agricultural Workers Protection Act, 29 U.S.C. Sec. 1801 et seq. The provision at issue was added in 1974, and was unchanged in 1983.
 
 
 6
 The Secretary of Labor has taken the position that the Act does not apply to commercial forestry workers. The plaintiffs sought a declaratory judgment that the Act applies to forestry workers and an injunction requiring the Secretary of Labor to enforce it in the industry. The district court granted the requested relief, 637 F.Supp. 271.
 
 DISCUSSION
 
 7
 I. Does the Migrant and Seasonal Agricultural Worker Protection Act apply to migrant and seasonal commercial forestry workers?
 
 
 8
 The Act originally adopted by reference the definition of "agriculture" contained in the Fair Labor Standards Act, and the definition of "agricultural labor" in the Internal Revenue Code. The Department of Labor interpreted the language of the Fair Labor Standards Act, 29 U.S.C. Sec. 203(f), to exclude forestry and lumbering operations from the rubric of "agriculture." That interpretation is codified in the Department's regulations. 29 C.F.R. 780.115. In the Department's view, "agriculture" is limited to work performed by a farmer or on a farm as an incident to or in conjunction with farming operations. 29 C.F.R. 780.200 (1986). The Internal Revenue Service has interpreted the Code definition, 26 U.S.C. Sec. 3121(g), similarly. See 26 C.F.R. 31.3121(g)-1(a) (1987).
 
 
 9
 When the Farm Labor Contractor Registration Act was rewritten in 1974, the definition of "agricultural employment" was supplemented. Section 1802(3) was amended to read:
 
 
 10
 The term 'agricultural employment' means employment in any service or activity included within the provisions of section 3(f) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(f)), or section 3121(g) of Title 26, and the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in its unmanufactured state.
 
 
 11
 29 U.S.C. Sec. 1802(3) (emphasis added). This definition was retained when the Act was rewritten and renamed in 1983. The question is whether the language added in 1974 broadens the coverage of the Act to include forestry work. The parties agree that the Act did not cover forestry work prior to the amendments.
 
 
 12
 In construing a statute in a case of first impression, the court looks first to the language of the statute itself, then to its legislative history, and then to the interpretation given to it by its administering agency. Brock v. Writers Guild of America West, Inc., 762 F.2d 1349, 1353 (9th Cir.1985). At all times, however, the goal is to determine congressional intent. "The court's objective is to ascertain the intent of Congress and to give effect to legislative will." Moorhead v. United States, 774 F.2d 936, 940 (9th Cir.1985).The Text of the Statute
 
 
 13
 At issue is the phrase "agricultural commodity." We focus on the definition of the word "agriculture." A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning. Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); Powell v. Tucson Air Museum Foundation of Pima County, 771 F.2d 1309, 1311 (9th Cir.1985). At the same time, "it is the duty of the court to give significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose, and to give effect to the statute as a whole, and not render it partially or entirely void." Matter of Borba, 736 F.2d 1317, 1320 (9th Cir.1984); Watt v. Alaska, 451 U.S. 259, 266, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981). It is necessary to look to the purpose and intent of a statute when deciding what its terms mean. Commissioner of Internal Revenue v. Engle, 464 U.S. 206, 217, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984); District of Columbia v. Carter, 409 U.S. 418, 420, 93 S.Ct. 602, 604, 34 L.Ed.2d 613 (1973); United States v. Boyden, 696 F.2d 685, 687 (9th Cir.1983); 4A Sands, Statutory Interpretation Sec. 58.06 (1984) ("It is ancient wisdom that statutes should be interpreted so that the manifested purpose or object can be accomplished.").
 
 
 14
 We recognize that forestry workers are not commonly viewed as agricultural workers. Our examination of the underlying purposes of the Act, however, compels our conclusion that forestry workers who raise trees as a crop for harvest are engaged in "agricultural employment" for purposes of the Act. The committee reports accompanying the Act state clearly that Congress' primary concern was the welfare of migrant laborers, particularly aliens, who are subject to abuse by labor contractors. See S. Rep. No. 1295, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S. Code Cong. & Ad. News 6441-45. The purpose of the Act was to regulate labor contractors wherever they operate. The conditions that Congress addressed in the Act, and the persons protected, are the same in the forestry industry as in more conventional agricultural industries. We find no principled reason for isolating forestry from all other agricultural areas in which migrant workers and labor contractors are common. As the district court noted, "[i]t is inconceivable that Congress intended to protect workers planting fruit trees in an orchard, and to disregard workers planting fir trees on a hillside, when both groups suffer from the same clearly identified harm."
 
 The Legislative History
 
 15
 Our interpretation of the Act is supported by the Legislative history. Congress expressly stated its understanding that farm labor contractors in the forestry business are within the Act's coverage:
 
 
 16
 The Committee has been informed by the Commissioner of the Immigration and Naturalization Service that some government agencies have permitted the employment of illegal aliens as tree planters, thinners and other forest laborers by awarding contracts to forestry contractors who regularly employ aliens who have illegally entered the United States. The provisions of this bill and its penalties are intended to apply to such contractors.
 
 
 17
 1974 U.S.Code Cong. & Ad.News at 6444. (The House Report, H.Rep. No. 1493, 93rd Cong., 2d Sess. (1974), does not address this issue.) In reviewing this part of the legislative history, the Eleventh Circuit held that "[t]here is little doubt that the 1974 Amendments to FLCRA were intended to apply to forestry contractors who employ 'tree planters, thinners and other forest laborers.' " Davis Forestry Corp. v. Smith, 707 F.2d 1325, 1328 n. 3 (11th Cir.1983) (decided on other grounds).
 
 
 18
 We need look no further. The Supreme Court has instructed that the first question for the court in interpreting a statute is whether Congress had a specific intent with respect to the issue at hand. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). This examination begins with the language of the statute, but the court may also inspect legislative history. Abourezk v. Reagan, 785 F.2d 1043, 1053 (D.C.Cir.), aff'd --- U.S. ----, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987). "If the court finds that Congress had a specific intent with respect to the issue, the court stops there and enforces that intent regardless of the agency's interpretation." Abourezk, 785 F.2d at 1053 (citing Chevron, 467 U.S. at 842-43 & n. 9, 104 S.Ct. at 2781-82 & n. 9). This statement of specific intent is not conclusive, but it reinforces our conclusion regarding the language and general purpose of the statute.
 
 
 19
 The Secretary argues that the reference to forestry in the committee report is a stray statement that never found expression in the language of the amendment to Sec. 1802(3) itself, and is therefore without effect. The amendment expanded the Act's coverage, the Secretary contends, but only in two ways: it removed the original restriction to "interstate" commerce, and provided for coverage of the processing of "agricultural and horticultural commodities" as well as their growing and harvesting.
 
 
 20
 There is no question that the amendment to Sec. 1802(3) effected the changes that the Secretary suggests, but there is no indication in the committee reports that those were the only changes intended. The Senate and House reports do not specify Congress' purpose in the amendment, but emphasize the nature and magnitude of the problem with labor contractors generally. Both reports note that the primary purpose of the amendment was to provide "coverage to all aspect of commerce in agriculture." 1974 U.S. Code Cong. & Admin. News at 6448. The words are ambiguous, but they suggest a general broadening of the definition of agricultural employment.
 
 
 21
 The language of the amendment itself contradicts the Secretary's argument. The added language does refer to such functions as "packaging, processing, freezing, or grading," which were not in the original definition of agricultural labor. But the amendment also covers the "handling, planting [or] drying" of agricultural commodities. These functions--if performed on a farm--are within the original definition of agricultural employment as derived from the Fair Labor Standards Act. The inclusion of these words in the amendment would be redundant if the amendment were not intended to place emphasis on the activity--any handling of an "agricultural or horticultural commodity"--and to de-emphasize the location of the activity. The amendment did not simply expand the Act to cover a wider range of activities. It was intended also to cover the planting and handling of agricultural products even when not done on a traditional "farm."
 
 Administrative Interpretation
 
 22
 The Secretary's most forceful argument is that we should defer to the Department's interpretation of the statute. Considerable deference is due an agency's interpretation and application of a statute it administers. Monet v. INS, 791 F.2d 752, 753 (9th Cir.1986); Dept. of Educ., State of Hawaii v. Bell, 770 F.2d 1409, 1413 (9th Cir.1985). However, the courts are the final authorities on issues of statutory interpretation. Federal Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 31-32, 102 S.Ct. 38, 41-42, 70 L.Ed.2d 23 (1981); California Energy Resources Conservation and Development Comm'n v. Johnson, 807 F.2d 1456, 1461 (9th Cir.1987). Courts should not "rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." Bureau of Alcohol, Tobacco & Firearms v. FLRA, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting NLRB v. Brown, 380 U.S. 278, 291-92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)); Sunshine Health Systems, Inc. v. Bowen, 809 F.2d 1390, 1394 (9th Cir.1987); Southern California Edison Co. v. FERC, 770 F.2d 779, 782 (9th Cir.1985).
 
 
 23
 The Secretary points to the Department's own long-standing interpretation of the Fair Labor Standards Act definition of "agricultural employment," which was incorporated in the earlier version of Sec. 1802(3). The focus of this case, however, is the amendment to Sec. 1802(3), which expanded the Act's coverage beyond the limits of the Fair Labor Standards Act definition. The Department did not construe Sec. 1802(3) in its amended form until the onset of this litigation. The Secretary's construction is entitled to no more deference than is the interpretation of any party to the suit. The underlying bases for deference to administrative interpretations are the agency's special expertise in the covered area, Bureau of Alcohol, Tobacco & Firearms v. FLRA, 464 U.S. at 97, 104 S.Ct. at 444, and the probative value of congressional acquiescence in a long-standing administrative construction of the statutory language, Abourezk v. Reagan, 785 F.2d at 1054-55. The question whether forestry is covered by Sec. 1802(3) is not one calling for expertise beyond that which the courts possess in the field of statutory construction, nor is it one about which the agency has previously expressed an opinion.
 
 
 24
 II. Was the relief granted by the district court too broad?
 
 
 25
 The Secretary argues that the district court should not have attempted to define "forestry workers" in its order, but should have allowed the Secretary to administer the statute as it applies to forestry. He argues also that the court should not have ordered him to propose amendments to regulations that are national in scope, as the suit was not a nationwide class action. We affirm the district court's declaratory judgment, but agree with the Secretary that the injunction granted was too broad.
 
 Scope of the Declaratory Judgment
 
 26
 The district court's declaratory judgment provided that the Secretary has a duty to enforce the Act "as to recruiting, soliciting, hiring, employing, furnishing or transporting any migrant or seasonal workers for all predominantly manual forestry work, including but not limited to tree planting, brush clearing, pre-commercial tree thinning and forest fire fighting." The Secretary objects that this language usurps the legislative function by attempting to set the limits of the term "forestry work."
 
 
 27
 The Secretary cites cases for the proposition that the agency, not the court, is responsible for determining the meaning of terms necessary for administration of the statute. None of those cases support the Secretary's position.[1] Here the district court used the language suggested by the plaintiffs to define the plaintiff group, rather than relying on the broad term "forestry workers." The court noted that its definition was not exclusive, and that the agency was free to refine it. The court did not order the Secretary to incorporate the precise language of the judgment in its regulations. We uphold the declaratory judgment. It does not impinge on any function of the Secretary.
 
 Scope of the Injunction
 
 28
 The district court ordered the Secretary to enforce the Act in the forestry industry, and to take other actions including:
 
 
 29
 (1) integrating ... forestry work into the U.S. Department of Labor's Coordinated Enforcement Plan when the Plan is next reviewed by the Department; amending the regulations implementing the MSPA to reflect that the MSPA applies to such forestry work within 120 days after the time for taking an appeal expires; and informing the U.S. Department of Agriculture (including the U.S. Forest Service) and of the Interior (including the Bureau of Land Management), and all persons on the lists maintained by the National Forests and the Bureau of Land Management of bidders on contracts for such forestry work, that the MSPA applies to such forestry work, by providing copies of this judgment and injunction....
 
 
 30
 The Secretary contends that these requirements, particularly the amending of Department regulations, affect a much larger group than just the plaintiffs in this suit. Citing National Center for Immigrants' Rights v. INS, 743 F.2d 1365, 1371 (9th Cir.1984), vacated, --- U.S. ----, 107 S.Ct. 1881, 95 L.Ed.2d 489 (1987), he argues that unless a suit is a class action, the injunction can cover only the named plaintiffs. National Center is not apt. In that case, the plaintiffs sought to enjoin the INS from enforcing a new regulation. The court remanded for the district court to consider whether a class should be certified. National Center, 743 F.2d at 1371. Because the injunction was preliminary, neither the trial court nor the court of appeals had ruled on substantive issues in the case, but had only determined that the plaintiff had a "fair chance" of prevailing on the merits. Id. In this case we have been called upon to rule on the question of statutory interpretation. Zepeda v. INS, 753 F.2d 719 (9th Cir.1985), which followed the rule of National Center, also concerned a preliminary injunction, and is limited to that situation. Zepeda, 753 F.2d at 728 n. 1. There is no general requirement that an injunction affect only the parties in the suit. Evans v. Harnett County Bd. of Educ., 684 F.2d 304, 306 (4th Cir.1982); Meyer v. Brown & Root Construction Co., 661 F.2d 369, 373-74 (5th Cir.1981).
 
 
 31
 Nevertheless, we recognize that agencies have sometimes been allowed to confine a ruling by one court of appeals to that circuit, and continue to enforce their own interpretation of the law elsewhere. The courts have not prevented agencies from applying varying interpretations in different circuits, but have been relegated to advising the agency to do otherwise. See Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910, 912 n. 1 (3d Cir.1981) ("We suggest that in most situations, a far better approach for an administrative agency would be to accept the first ruling of a court of appeals on a particular point or else seek reversal in the Supreme Court or a statutory change by Congress. To shop in a number of court of appeals in hopes of securing favorable decisions is not only wasteful of overtaxed appellate resources but dissipates agency energies as well."). The Secretary argues that the effect of the district court's order requiring changes in departmental regulations and other actions is to require the national adoption of the court's interpretation of the Act, denying the Department's privilege to enforce its own interpretation in other jurisdictions.
 
 
 32
 The Supreme Court has held that a federal agency is not necessarily entitled to confine any ruling of a court of appeals to its immediate jurisdiction. In Califano v. Yamasaki, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979), the Court held that there are no legal limits on the geographical scope of a class action brought in federal district court. 442 U.S. at 702, 99 S.Ct. at 2558. The Court then stated:
 
 
 33
 We concede the force of the Secretary's contentions that nationwide class actions may have a detrimental effect by foreclosing adjudication by a number of different courts and judges, and of increasing, in certain cases, the pressures on this Court's docket. It often will be preferable to allow several courts to pass on a given class claim in order to gain the benefit of adjudication by different courts in different factual contexts. For this reason, a federal court when asked to certify a nationwide class should take care to ensure that nationwide relief is indeed appropriate in the case before it.... But we decline to adopt the extreme position that such a class may never be certified.
 
 
 34
 Id. at 702-03, 99 S.Ct. at 2558. The primary concern, the Court noted, must be that the relief granted is not "more burdensome than necessary to redress the complaining parties." Id. Thus there is no bar against class-wide, and nationwide relief in federal district or circuit court when it is appropriate.
 
 
 35
 The Secretary contends that nationwide relief is inappropriate where no class has been certified. We have already distinguished our holdings in National Center and Zepeda. A closer examination of those cases indicates that the logic behind them cannot control here. Our holdings there stemmed from the more general rule that a federal court may not attempt to determine the rights of persons not before the court. Zepeda, 753 F.2d at 727. The limited usefulness of that rule is suggested by this case. Here, a major class of persons that will be affected by our ruling--labor contractors operating in the forestry business--is not before the court. The fact that forestry labor contractors are not among the parties here does not prevent the district court, or this court, from issuing an injunction directed to the Secretary requiring him to enforce the act against forestry labor contractors. The import of the rule underlying Zepeda is that an injunction cannot issue against an entity that is not a party to the suit. The injunction here was issued only against the Secretary, who is a party.
 
 
 36
 Moreover, in Zepeda we noted expressly that in that case the injunctive relief requested could "be granted to the individual plaintiffs without the relief inevitably affecting the entire class." 753 F.2d at 729 n. 1. Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown. Id. at 727. On the other hand, an injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit--even if it is not a class action--if such breadth is necessary to give prevailing parties the relief to which they are entitled. Gregory v. Litton Systems, Inc., 472 F.2d 631, 633-34 (9th Cir.1972); Professional Ass'n of College Educators v. El Paso County Community College Dist., 730 F.2d 258, 274 (5th Cir.), cert. denied, 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984). Cf. Yamasaki, 442 U.S. at 702, 99 S.Ct. at 2558; Zepeda, 753 F.2d at 728 n. 1.
 
 
 37
 Class-wide relief may be appropriate even in an individual action. Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1136 (11th Cir.1984); Harnett County Bd. of Educ., 684 F.2d at 306; Meyer, 661 F.2d 369, 373. In this case the district court could hardly require enforcement of the Migrant and Seasonal Workers Protection Act on anything other than a nationwide basis. Although individual migrant laborers are plaintiffs in this action, it is labor contractors who are most directly affected by the injunction against the Secretary. The Secretary has not suggested how the injunction to enforce can be limited to any particular group of forestry labor contractors. The Act cannot be enforced only against those contractors who have dealings with named plaintiffs, or against those contractors only insofar as they have dealings with named plaintiffs. Nor could an injunction order enforcement only as to those contractors whose base of operations is in the Ninth Circuit. Migrant laborers who are parties to this suit may be involved with contractors whose operations are concentrated elsewhere. Similarly, these plaintiffs, as migrant laborers, may travel to forestry jobs in other parts of the country under the supervision of labor contractors. We conclude that the district court did not abuse its discretion in ordering what is in effect nationwide relief. Because the Secretary is a party to this suit, an injunction against him requiring enforcement of the Act as to the forestry-related activities identified in the district court's declaratory judgment is appropriate. The district court has the power to order nationwide relief where it is required. Yamasaki, 442 U.S. at 702, 99 S.Ct. at 2558.
 
 
 38
 The district court's injunction is not over-broad for the reasons suggested by the Secretary. However, because it requires the Secretary to take specific measures in enforcing the Act against forestry labor contractors, it intrudes unnecessarily on the administrative function of the agency. "[A] court may exercise its equity powers, or equivalent mandamus powers to compel courts, boards or officers to act in a matter with respect to which they may have jurisdiction, although the court will not assume to control or guide the exercise of their authority." Virginian Ry. Co. v. System Federation No. 40, Ry. Employees Dept., 300 U.S. 515, 551, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937). An injunction against a government agency must be structured to take into account "the well-established rule that the government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.' " Rizzo v. Goode, 423 U.S. 362, 378-79, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976) (quoting Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961)). The manner in which the Secretary implements the court's order to enforce the Act is, in the first instance, a matter of agency discretion. That part of the court's order requiring the Secretary to amend departmental regulations, re-write the departmental Coordinated Enforcement Plan, and notify others of the court's ruling prescribes specific actions that may not be necessary to enforce the Act against forestry labor contractors, and therefore requires more than is necessary to give complete relief to the plaintiffs. See Ameron, Inc. v. U.S. Army Corp of Eng'rs, 787 F.2d 875, 890-91 (3d Cir.1986) (striking part of district court's order requiring government defendants to "secure the issuance of regulations" implementing court's decision), affirmed, 809 F.2d 979 (3d Cir.1986) (en banc). We therefore substitute the following language for the challenged part of the district court's order:
 
 
 39
 2. PERMANENT INJUNCTION. William Brock and his successors in office are enjoined to cease refusing to enforce the Migrant and Seasonal Agricultural Workers Protection Act, Pub.L. 97-470, 96 Stat. 2583 (1983), codified as 29 U.S.C. Sec. 1801 et seq., as to recruiting, soliciting, hiring, employing, furnishing or transporting any migrant or seasonal worker for all predominantly manual forestry work, including but not limited to tree planting, brush clearing, precommercial tree thinning and forest fire fighting.
 
 
 40
 III. Attorney's Fees under the Equal Access to Justice Act
 
 
 41
 The Equal Access to Justice Act provides that a court may award attorney's fees to a prevailing party in an action against the United States. Fees are not available, however, if the government's position was "substantially justified." 28 U.S.C. Sec. 2412(d)(1)(A). We have used a "reasonableness" test in determining whether an agency's position is substantially justified. League of Women Voters v. FCC, 798 F.2d 1255, 1257 (9th Cir.1986). In 1985 the Equal Access to Justice Act was amended, and although the "substantially justified" standard was retained, the committee report made the following comment:
 
 
 42
 Several courts have held correctly that "substantial justification" means more than merely reasonable. Because in 1980 Congress rejected a standard of "reasonably justified" in favor of "substantially justified," the test must be more than mere reasonableness.
 
 
 43
 H.R.Rep. No. 120, 99th Cong., 1st Sess. 9, reprinted in 1985 U.S.Code Cong. & Admin.News 132, 138. The report pointed out that actual awards made in the first three years in which the Act was effective were "dramatically less" than what had been estimated, and concluded that part of the problem was the courts' misunderstanding of the meaning of "substantial justification." H.R.Rep. No. 120 at 9, U.S.Code Cong. & Admin.News 1985, p. 138.
 
 
 44
 The district court recognized that this legislative history required a showing that the Secretary's position was "more than merely reasonable." But it relied on our prior holding that, where only legal issues are raised, the United States must demonstrate that it had a reasonable basis in law. Edwards v. Heckler, 770 F.2d 1496, 1502 (9th Cir.), superseded, 789 F.2d 659, 665 (9th Cir.1985). The court found that although "the plaintiffs' and plaintiffs-intervenors' position is more sound and logical, the government did maintain an arguably defensible position that had a reasonable basis in law." The court noted that the statute is ambiguous, and that there was no direct authority on which either side could rely.
 
 
 45
 Ordinarily we determine whether the district court applied an incorrect legal standard, and whether its decision was based on clearly erroneous findings of fact. SEC v. Carter Hawley Hale Stores, Inc., 760 F.2d 945, 947 (9th Cir.1985).
 
 
 46
 We need not enter the debate over which standard to apply. The Secretary's position was "substantially justified" under either a reasonableness or "more than mere reasonableness standard." See Oregon Environmental Council v. Kunzman, 817 F.2d 484, 498 (9th Cir.1987).
 
 CONCLUSION
 
 47
 The declaratory judgment of the district court is affirmed. The court's injunction is affirmed but modified in part. The denial of attorney's fees to plaintiffs is affirmed.
 
 
 48
 J. BLAINE ANDERSON, Circuit Judge, concurring and dissenting:
 
 
 49
 The declaratory judgment of the district court is affirmed. The court's injunction is affirmed but modified in part. The denial of attorney's fees to plaintiffs is affirmed.
 
 
 50
 I respectfully dissent from Part I of the majority opinion. The majority opinion brings this court too far into the realm and province of legislative law-making, a function we are ill-equipped to perform.
 
 
 51
 Many cases have examined, in various contexts, whether forestry and its related functions are considered an "agricultural" pursuit. The only consistent feature running throughout these cases is their inconsistency in result.
 
 
 52
 In N.L.R.B. v. Scott Paper Company, 440 F.2d 625 (1st Cir.1971), the First Circuit held, in dicta, that "woodsmen" were not "agricultural workers" expressly exempted from the National Labor Relations Act. Id. at 626-27 n. 3. This holding was based, in part, on a Ninth Circuit case which analyzed whether a construction activity was considered agricultural by examining "whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity." N.L.R.B. v. Monterey County B. & C. Trades Council, 335 F.2d 927, 930 (9th Cir.1964) (emphasis in original), cert. denied, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965) (quoting Farmers Irrigation Co. v. McComb, 337 U.S. 755, 760-61, 69 S.Ct. 1274, 1277-78, 93 L.Ed. 1672 (1949)). The First Circuit found that the kind of work done by these woodsmen [felling, topping, limbing, bucking and hauling trees] was wholly integrated into a complex, industrialized production process and was sensibly deemed non-agricultural. Scott Paper, 440 F.2d at 627 n. 3. From the beginning, the forestry industry has conducted itself as a separately organized, independent productive activity.
 
 
 53
 Recent federal cases have taken a slightly different approach in deciding whether forestry, logging, etc., are included in the definition of "agricultural." In United States v. Norman G. Jensen, Inc., 550 F.2d 662 (Cust. & Pat. App. 1977), the Court of Customs and Patent Appeals held that:
 
 
 54
 In light of the long-standing intent of Congress that "agricultural" be most broadly defined and of the legislative history of current laws showing that Congress has, since well before enactment of the [Tariff Schedules of the United States] TSUS, regarded the harvesting of a timber crop on a farm to be like any other crop in a general farm program, we hold that the use of Tree Farm log skidders in skidding logs on farms, including tree farms, is part of the process of harvesting timber crops and that such use is "agricultural" for purposes of item 692.30, TSUS.
 
 
 55
 Id. at 668.
 
 
 56
 In deciding whether the use of log skidders to skid logs was "agricultural," the court did an extensive examination of the definition of agriculture. See id. at 666-67. It found that older editions of Webster's New International Dictionary (1913) and the then current edition of Funk & Wagnall's Standard Dictionary (1963) both included the word "forestry" in their definitions of agriculture. While "the word 'forestry' was subsequently dropped from the Webster's definition ... Funk & Wagnall's continued to include it." Id. at 667. Also, the court pointed out, "Webster's definition [still] includes 'harvesting crops' and 'the production of plants' which includes trees." Id. at 666. The court also went into an extensive discussion of the congressional intent to broadly define agriculture, as does the majority opinion. See id. at 667-68. Finally, of interest is a footnote in which the court stated:
 
 
 57
 Appellant points out that, of the fourteen witnesses who testified, four were employed as loggers and "were in agreement that, as loggers, they did not work on farms and did not consider themselves to be farmers." From this, appellant argues that "the people engaged in logging as a commercial endeavor do not consider their work to be agricultural in nature." However, such testimony on a question of law can hardly be considered binding on this court. United States v. O. Brager-Larsen, 36 CCPA, 1, 3, C.A.D. 388 (1948). The same is to be said for the testimony of one of appellant's witnesses, a union official, that unionized skidder operators are members of the International Woodworkers of America, which does not represent agricultural or farm workers.
 
 
 58
 Id. at 667 n. 10. Although, perhaps not binding on the court, this testimony nevertheless indicates that common usage and understanding by commercial loggers is that they are not engaged in an agricultural endeavor.
 
 
 59
 A later case from the Federal Circuit recognized the narrow holding in Jensen:
 
 
 60
 The holding in Jensen was only that the use of that tractor for dragging logs "on farms, including tree farms " was an agricultural use of the tractors....
 
 
 61
 United States v. Border Brokerage Co., Inc., 706 F.2d 1579, 1580 (Fed.Cir.1983) (emphasis added). Nevertheless, basing its decision on the rationale in Jensen (i.e., the congressional intent that "agriculture" be broadly defined and the legislative history of current laws showing that Congress has regarded the harvesting of a timber crop on a farm to be like any other crop in a general farm program), the Federal Circuit broadly held that "the growing of trees and the harvesting of them is an agricultural pursuit." Id. at 1580-81. This holding was based on the reasoning that "the majority of the timber lands [including national and state forest lands] are either tree farms or operated in the same way as tree farms, and [ ] the existence vel non of a tree farm depends upon how it is operated...." Id. at 1581 (emphasis added). The cases of Jensen and Border Brokerage are well-reasoned, thorough cases analogous to, and supporting of, the majority opinion. Of course, in its broad holding, Border Brokerage was only deciding the definition of agriculture as it relates to customs and trade laws in determining whether an item is an agricultural implement. That case does not address the issue before us today.
 
 
 62
 Several state law cases discuss the relationship between forestry workers and agriculture. In Just-A-Mere Farm, Inc. v. Peet, 247 Or. 413, 430 P.2d 987 (1967), the Oregon Supreme Court, in examining a similarly worded statute,[1] held that:
 
 
 63
 Although, with the development of selective cutting of timber, it is not uncommon to refer to timber as a "crop," we do not think that in common parlance the growing of trees for the purpose of producing lumber is regarded as an agricultural operation....
 
 
 64
 Id. 430 P.2d at 989. The court found that the activities included in "agricultural labor":relate directly or indirectly to operations which are commonly regarded as associated with farming in its traditional sense, i.e., where the work performed is directly or indirectly connected with the production and sale of that which the land yields annually in the form of crops or animals. This, we think, was intended in defining "agricultural labor" in terms of "services performed * * * in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity....
 
 
 65
 Id.
 
 
 66
 In Appleman v. Employment Division, 21 Or.App. 186, 534 P.2d 218 (1975), the court held:
 
 
 67
 We cannot view the raising of commercial timber seedlings as being an operation which is commonly regarded as associated with farming in its "traditional sense," regardless of whether the seedlings are sold to others or retained and raised for timber. Although, as the court explained in Just-A-Mere, it is not uncommon to refer to timber as a "crop," the growing of trees, or in this case seedlings, is not understood in the common parlance as an agricultural operation.
 
 
 68
 Id. 534 P.2d at 220 [footnote omitted]. The court further found that timber tree seedlings were not "agricultural or horticultural commodities" as these terms are commonly used and understood. Id. at 220-21.
 
 
 69
 Finally, in Mountain Credit v. Michiana Lumber & Supply, Inc., 31 Colo.App. 112, 498 P.2d 967 (1972), the Colorado Court of Appeals held, in deciding whether a log loader was farm equipment, that:
 
 
 70
 Defendants argue that timber is an issue of the soil and should be considered a farm product. As such, defendants would have us hold that the logging of timber is a farming operation and a log-loader used exclusively for harvesting timber is "equipment used in farming operations," making filing with the county clerk and recorder the proper procedure. Farming in the traditional sense, however, pertains to preparation of soil, planting of seeds, caring for crops, and harvesting the yield at the end of the process. One can be a farmer of trees if they are grown from seed and cared for in a nursery setting, but the commercial logging of trees by a firm such as Loggers, Inc., is not farming. It is an industrial operation.
 
 
 71
 Id. 498 P.2d at 969. Furthermore, the court found that because "neither the statute nor the official comment make reference to logging, we do not think it proper to incorporate that enterprise into the definition of farming." Id. I agree and believe we should exercise the same restraint.
 
 
 72
 Although each of these state law cases can be distinguished from the case at bar, I believe they reflect a commonsense approach to the determination of the issue at hand.[2] In common parlance, the commercial logging industry is not ordinarily thought to be an agricultural industry nor are commercial loggers and forestry workers considered to be agricultural laborers. Nor do I believe that the legislative intent and history support the majority view. From 1974 to the present, the crucial provisions and language of the Act have remained the same. The Act was thoroughly reviewed by Congress in 1983, yet no changes were made to extend the Act to commercial forestry and logging operations. Forestry is a common word. Legislators know it, understand it, and can use it. They did not.
 
 
 73
 The specific intent found by the majority is not expressed in the language of the Act. It derives from a stray remark by the Senate that "[t]he provisions of this bill and its penalties are intended to apply to such contractors." 1974 U.S.Code Cong. & Ad.News at 6441, 6444. This issue was not addressed by the House nor was the remark or its substance included in the 1974 or 1983 amendments. If anything, this stray remark indicates Congress' awareness of the difference between forestry and agricultural workers. The fact that there was no further mention or discussion of this issue suggests to me that the inclusion of forestry workers was considered and rejected by Congress.
 
 
 
 [1]
 In Heckler v. Chaney, 470 U.S. 821, 831-32, 105 S.Ct. 1649, 1655-56, 84 L.Ed.2d 714 (1985), the Court held that an agency has discretion to determine whether to prosecute or enforce a statute in a specific case. That discretion is necessary for the agency to order its priorities and allocate its resources. Id. In FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981), the Court held that "the task for the Court of Appeals was not to interpret the statute as it thought best but rather the narrower inquiry into whether the Commissioner's construction was 'sufficiently reasonable' to be accepted by a reviewing court." The Court did not discuss the permissible scope of remedies for unreasonable administrative interpretations. In Railway Labor Executives Ass'n v. Dole, 760 F.2d 1021, 1023-24 (9th Cir.1985), the court held that the plaintiffs did not have standing because the remedy requested could not be granted; the complaint asked the courts to determine how many inspectors must be present at a railway site to prevent injury. The question here is not one of standing, or of the court's ability to give a remedy
 
 
 [1]
 "Agricultural labor" includes all services performed:
 "(d) in handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity, but only if such service is performed as an incident to ordinary farming operations....
 
 
 [2]
 Other state law cases finding that forestry-related activities are not agricultural include: Plumfield Nurseries, Inc. v. Dodge County, 167 N.W.2d 560, 563, 184 Neb. 346 (1969); Sniegowski v. Bureau of Unemployment Compensation, 228 N.E.2d 679, 681, 11 Ohio App.2d 73, 40 O.O.2d 236 (1966); Kirby Lumber Corp. v. Hardin Independent School Dist., 351 S.W.2d 310, 312 (Tex.Civ.App.1961)